## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                              :

MIA TYLER,                      :
                              :

             Plaintiff,      :      CIVIL ACTION
                              :

        vs.                :
                              :

GUARDIAN PROTECTION SERVICES,  :     NO.  11-628
                              :

          Defendant.     :
_____:

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                          **OCTOBER 10, 2012**

       Presently before the Court is Defendant, Guardian Protection Services' ("Guardian"),

Motion for Summary Judgment filed against Plaintiff, Mia Tyler ("Tyler").  For the reasons

stated below, we will grant the Motion in part and deny it in part.

## I.       BACKGROUND

       Tyler filed the instant Complaint on January 31, 2011, for unlawful race and gender

discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981.  Tyler,

an African-American female, asserts that she was employed by Guardian from July 2, 2008, until

June 16, 2009, and that she was a highly successful employee.  (Compl. ¶¶ 14-16.)  Guardian's

principal business is the provision of electronic commercial and residential security systems.

(Id.)  It has branch offices in various parts of the United States including Pennsylvania.  (Def.'s

Mot. Summ. J. at 3.)  Within each of its branches, Guardian has a "Residential Division" and a

"Builder Division."  (Id.)  The Residential Division handles the sale, installation, monitoring, and

service of electronic security systems to individual homeowners.  (Id.)  The Builder Division

handles the sale, installation, monitoring, and service of electronic security and other technology products and services during the construction of new homes built by residential developers who have exclusively partnered with Guardian.  (Id.)

In July 2008, Guardian hired Tyler in the Residential Division of its Orlando, Florida branch office, but within two months Tyler requested a transfer to Guardian's Philadelphia branch.  (Id. at 4.)  At the Philadelphia branch, Tyler interviewed with Isadore Grant, Jr. ("Grant"), the Builder Division Sales Manager, General Manager, Joseph "Buzz" Ebner ("Ebner"), and District Manager, Jay Warnick.  (Id.)  Tyler was hired for a position called Builder Life Safety Consultant ("LSC"), and began work in the Philadelphia branch beginning September 2, 2008.  (Id.)  LSCs are sales representatives for the Builder Division, and each LSC is assigned a specific territory consisting of a number of communities under development by Guardian's builder partners.  (Id.)  The majority of the Philadelphia branch's business came from three major builder partners: Ryan Homes ("Ryan"), NV Homes ("NV"), and Berks Homes ("Berks").  (Id.)  Tyler's job with Guardian was to sell residential security systems and other technologies to individuals who had contracted with Guardian's corporate clients to build new homes.  (Id.)

Tyler alleges that after several months in this position, she "received a bogus evaluation which was pretextual in nature for allegedly making administrative mistakes."  (Compl. ¶ 18.) Tyler further avers that Guardian intentionally discriminated against her as a result of her race and gender, and thereby denied her the benefits of "the contractual relationship she had entered with Guardian by disciplining her for pretextual reasons, subjecting her to harassment as a result of her race, and terminating her employment for pretextual reasons."  (Id. ¶ 24.)  After the filing

of the Complaint, the parties were involved in lengthy discovery disputes.[1]

Guardian filed a Motion for Summary Judgment on March 3, 2012.  On March 20, 2012, Plaintiff filed a Motion for an Extension of Time to Complete Discovery asking for additional discovery time to conduct more depositions so as to be able to properly respond to the Motion for Summary Judgment.  (Doc. No. 46.)  On March 23, 2012, we granted this Motion and set April 9, 2012, as the deadline for Tyler to respond to the Summary Judgment Motion.  (Doc. No. 48.) On April 4, 2012, we held a telephone conference with the parties to discuss a Motion for a Continuance that Tyler was seeking for the purpose of taking five additional depositions of employees and former employees of Guardian.  We granted this request and such depositions were conducted.  Tyler, subsequently, filed a Response to Guardian's Summary Judgment Motion on July 24, 2012.[2]  Guardian filed a Reply in support of its Motion on August 3, 2012.[3] (Doc. No. 76.)  On September 28, 2012, we ordered Tyler to file a response to Guardian's assertion that she failed to file her Complaint within ninety (90) days after the EEOC issued a "Right to Sue Letter."  (Doc. No. 78.)  Tyler filed her Response on October 8, 2012.  (Doc. No. 79.)

---

[1]For a complete procedural history, including the discovery history between the parties, see our prior Memorandum Opinion, Tyler v. Guardian Protection Services, No. 11-628, 2012 WL 2873568, at *1 (E.D. Pa. July 13, 2012).

[2]Tyler states in her Response that she is not proceeding on her claims for racial and sexual harassment.  Accordingly, we will grant summary judgment on these causes of actions.

[3]As will be discussed infra., in this Reply, Guardian asserts for the first time that Tyler failed to file her Complaint within ninety (90) days after receipt of the "Right to Sue Letter" issued by the Equal Employment Opportunity Commission ("EEOC").  (Def.'s Reply at 20.)  Guardian argues that its Motion for Summary Judgment should also be granted on this basis.  (Id.)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).

If the court determines that there are no genuine issues of material fact, then summary judgment

will be granted.  <u>Celotex</u>, 477 U.S. at 322.

## III.    DISCUSSION

### A.    **<u>McDonnell Douglas</u> Analysis**

Title VII prohibits employment practices that result in disparate treatment (intentional

discrimination) if the practices are based in any way on race, color, religion, sex, or national

origin.  <u>See</u> 42 U.S.C. § 2000e–2.  This section states:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) To limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a).

The evidence Tyler sets forth in her Title VII claim is characterized as indirect evidence

of discrimination, and therefore, will be analyzed using the well-established <u>McDonnell Douglas</u>

burden-shifting framework.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Briefly summarized, the <u>McDonnell Douglas</u> analysis proceeds in three stages.  First, the plaintiff

must establish a prima facie case of discrimination.  If the plaintiff succeeds in establishing a

prima facie case, the burden shifts to the defendant "to articulate some legitimate,

nondiscriminatory reason for the employee's rejection." <u>Id.</u>  Finally, should the defendant carry

this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  See Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981).  While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Id.

First, plaintiff must establish a prima facie case of discrimination.  Id.  Plaintiff makes a prima facie case by showing: 1) she is a member of a protected class; 2) she suffered an adverse employment action; and 3) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d. Cir. 2008).  At the prima facie stage of the analysis, the court merely determines if plaintiff has presented sufficient evidence so that the court should move on to the second step of the analysis. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

Here, we find that Tyler has established a prima facie case of race/sex discrimination.  It is undisputed that she is a member of a protected class being an African-American female.  In addition, she has suffered an adverse employment action in that she was terminated from her employment with Guardian.  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). We also find that Tyler has presented sufficient evidence that her termination occurred under circumstances that could give rise to an inference of intentional discrimination.  See Makky, 541 F.3d at 214.

6

Here, Tyler asserts that she was terminated by three males.  (Pl.'s Resp. Mot. Summ. J. at 6.)  Tyler adds that she was one of four sales persons who were supervised by Grant, an African-American male, who was Guardian's Builder Division Sales Manager, and all of her fellow salespersons and supervisors were white males with the exception of Grant and one other sales person.  (Id.)  Tyler asserts that while employed by Guardian she was treated differently than her similarly situated co-workers in that she was not given sufficient training, such as sales "bootcamp training,"[4] whereas all of the male salespersons had been given such training.  (Id.)  Tyler also claims that the male salespersons worked under a different compensation plan than her compensation plan.  (Id.)  Moreover, Tyler asserts that the male salespersons were not subjected to formal, written reviews and appraisal meetings with Ebner and Grant, whereas she was subjected to two reviews within a period of two months.  (Id.)  Tyler adds that after she was terminated, Guardian replaced her with a white male, and that after this person left the company, it replaced him with another white male.  (Id.)  Tyler further adds that following this male's departure from Guardian, it hired a third male, none of whom were subject to written performance appraisals.  (Id. at 7.)  Based on these assertions, we find that Tyler has made out a prima facie case of discrimination.

We now move to the second part of the McDonnell Douglas test.  If a plaintiff is successful in making out a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection."  Jones, 198 F.3d at 410, (citing McDonnell Douglas, 411 U.S. at 802).  The employer's burden is satisfied by simply

---

[4]"Boot camp" refers to sales training that Tyler claims was regularly held at Guardian's corporate offices in Pittsburgh, Pennsylvania.

7

explaining its actions or producing evidence of a legitimate nondiscriminatory reason.  Texas

Dep't of Cmty. Affairs, 450 U.S. at 255.  This burden is merely one of production, not one of

persuasion.  Id. at 256–258.  Defendant's explanation of its legitimate reasons must be clear and

specific.  Id. at 258.  We find that Guardian has met this burden.

Guardian sets forth several "legitimate, nondiscriminatory" reasons for its decision to

terminate Tyler's employment.  First, it asserts that Tyler's sales paperwork was repeatedly

plagued by errors and was "incomplete, untimely, and illegible."  (Def.'s Mot. Summ. J. at 10.)

As examples of such, Guardian states that: 1) when Tyler sold a central vacuum system, she

repeatedly failed to turn in a completed central "vac" form with her sales paperwork; 2) when

Tyler sold an AlarmNet, which is a cellular back-up to Guardian's landline security monitoring,

she repeatedly failed to turn in a necessary AlarmNet agreement with her sales paperwork, and

other paperwork related to AlarmNet sales; 3) Tyler repeatedly failed to obtain all of the

necessary customer signatures and initials on her sales contracts; 4) Tyler repeatedly failed to

submit mark-out paperwork in a timely manner; and 5) Tyler had a recurring problem with

turning in paperwork with illegible handwriting and with items scratched out or written over.

(Id. at 10-12.)

Guardian also asserts several other "legitimate, nondiscriminatory" reasons for its

decision to terminate Tyler.  It argues that Tyler lacked sufficient technical comprehension of the

technology options that it offered which led to repeated errors in her work.  For example,

Guardian states that Tyler did not understand that if a customer wanted to place a television over

a fireplace, the wiring could not be placed in the same stud bay because the wiring would go up

the chimney and through the fireplace.  (Id. at 13.)  Guardian claims that Tyler made this mistake

several times despite being corrected for such.  (Id.)  Guardian next states that Tyler did not

understand each stage of the Builder Division process and, as a result, failed to take appropriate

actions at each stage.  For example, Tyler was leaving sales contracts in model homes for Ryan's

personnel to present to customers for execution when she should have been personally meeting

with Guardian's customers.  (Id.)

Guardian adds that Tyler was unprofessional in interactions with builder partners and was

unprofessional in her interaction with home buyers.  (Id.)  Guardian asserts that customers

complained that Tyler was disrespectful and did not understand the equipment, was

uncooperative in scheduling appointments, and was unresponsive to customer calls.  (Id. at 15-

17.)  Guardian cites to a complaint about Tyler from customer, Joshua Brandt ("Brandt").  (Id.)

According to Guardian, Brandt complained of being unable to reach Tyler by phone, and he

stated that "if I would have known that I had to go through with this mess with Guardian I would

have never signed with Berks Homes," and "I do not want to do my walk thru with Mia when we

have to place locations in our home."  (Id., at Tab A, Ex. 41.)[5]  Brandt also stated that "I'm not

very confident in anything that Mia says."  (Id.)  Guardian claims that upon learning of Brandt's

complaints, on March 5, 2009, Berks Vice President, Mike Condos, contacted Grant and stated

that "from this day forward Mia is not to represent Berks Homes."  (Id.)

In addition, Guardian argues that Tyler received poor performance appraisals.  On April

---

[5]Guardian has attached its exhibits to its Motion using "Tabs," and cites to these exhibits by Tab
letters.  To avoid confusion, we will also cite to Guardian's exhibits using its corresponding Tab letters.

20, 2009,[6] Grant conducted the first of two "Performance Appraisals," and rated Tyler in eleven categories of performance, giving her scores between 1.0 (Unsatisfactory) to 5.0 (Outstanding). (Id., Ex. 42.)  Overall, Tyler received a 1.77 rating out of 5.0 from Grant which placed her between "Unsatisfactory" and "Marginal."  (Id.)  Grant also noted that Tyler's performance was "seriously deficient requiring immediate attention or correction or termination will be imminent." (Id.)  Because of such, Grant outlined a detailed set of objectives and goals for Tyler to improve her performance.  (Id.)  The Performance Appraisal also stated that Tyler would be rated again on May 26, 2009, to determine whether she had made the required improvements.  (Id.)

Guardian states that Grant intended to review Tyler's Performance Appraisal with her after a sales meeting on March 24, 2009, but Tyler purportedly fell and injured herself in a home under construction on March 23, 2009.  She informed Grant by text that night that she would be unable to attend the sales meeting because of the injury.  (Id. at 20.)  In connection with this injury, Tyler was out of work from this date through April 19, 2009.  Guardian asserts that Tyler's unprofessional behavior continued throughout her leave as evidenced by Grant's attempts to contact her about customers who may have needed attention during her absence, but she failed to return his messages.  (Id.)  Guardian also argues that Tyler's poor performance continued after her first Performance Appraisal in that her paperwork continued to be sloppy and contain errors. (Id. at 21-24.)  Tyler was given a second Performance Appraisal on May 26, 2009, which was also prepared by Grant.  Tyler's overall score placed her performance again between "Marginal" and "Unsatisfactory."  (Id., Tab A, Ex. 43.)  Grant recommended the "immediate removal of Mia

---

[6]Although the Performance Appraisal is dated April 20, 2009, it is apparent that it was actually conducted sometime in March 2009 as Grant testified at his deposition that he completed the appraisal before March 23, 2009.  (Def.'s Mot. Summ. J., Tab D at 33.)

from the Builder Division and determine if she has the skill set to serve Guardian in another division."  (Id.)

Guardian further asserts that the final occurrence that mandated its decision to terminate Tyler was a meeting with Grant and representatives of Ryan and NV where these representatives presented Grant with a questionnaire completed by a customer complaining about Tyler and stating that she would never work with Guardian again.  (Id., Tab J, Ex. 6.)  Grant testified that these representatives told him that it was no longer acceptable for Tyler to represent them, and they insisted that she be removed from their accounts.  (Id., Tab D at 59-61.)  Accordingly, on June 16, 2009, Grant and Ebner advised Tyler that her employment with Guardian was terminated.  We are of the opinion that the explanations stated above are "legitimate, nondiscriminatory" reasons to terminate Tyler's employment.  Thus, we find that Guardian has met its burden at this step of the analysis.

Finally, because Guardian has carried its burden, Tyler must prove by a preponderance of the evidence that the legitimate reasons offered by Guardian were a pretext for discrimination. Jones, 198 F.3d at 410.  "Most cases turn on this third step, i.e., whether plaintiff can establish pretext."  Id.  "At this point the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination."  Id. at 412.  "At trial, the plaintiff must convince the finder of fact both that the reason was false, and that the discrimination was the real reason."  Id. at 412–413 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

A plaintiff may defeat a motion for summary judgment by pointing to some evidence from

which a reasonable factfinder would either: 1) disbelieve the employer's articulated legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Jones, 198 F.3d at 413. This gives plaintiff two possible avenues to defeat a motion for summary judgment. "Plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . rather, the nonmoving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Fuentes v. Perskis, 32 F.3d 759, 765 (3d Cir. 1994). "Plaintiff also may survive summary judgment by pointing to evidence in the record which "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Jones, 198 F.3d at 413 (citing Fuentes, 32 F.3d at 764). For example, to prove this prong, plaintiff may show that the employer has previously discriminated against plaintiff, or others in plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class. Id. at 413.

Here, while Guardian has offered several "legitimate, nondiscriminatory" reasons for its decision to terminate Tyler's employment, we are of the opinion that this action survives summary judgment because Tyler has pointed to a number of "inconsistencies," and "contradictions in the employer's proffered reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765. In addition, Tyler offers sufficient evidence to survive summary judgment because a reasonable factfinder could also find that her similarly situated male co-workers were treated more favorably. Jones, 198 F.3d at 413.

In a form dated July 20, 2009, entitled "Request for Relief from Charges" from the Pennsylvania Department of Labor and Industry involving Tyler's claim of wrongful termination, a Guardian representative indicated that Tyler was discharged for "[l]ack of sales and sales related performance." (Pl.'s Resp. Mot. Summ. J., Ex. F.) However, there is contradictory evidence in this record which indicates that Guardian was very pleased with Tyler's sales numbers and, in fact, acknowledged her as one of its sales leaders in December 2008 and the early months of 2009.

In its "Position Statement" filed with the Court, Guardian acknowledges that in December 2008, Tyler began work in her sales territory and during that month she made twenty sales from twenty-three leads provided by the builder partners, and was ranked second on their "Builder LSC of the Month" list.[7] (Def.'s Mot. Summ. J., Tab I, Position Statement at 4-5.) Guardian also acknowledges that Tyler was "also in a six-way tie for 10th [tenth] position on the Employer's 'Top 10 Builder LSC' list." (Id. at 5.) Guardian further indicated that during January 2009, Tyler placed sixth on the "Top Ten Builder LSC" list with fellow male workers, Robert Blackman ("Blackman"), Curtis Lowe ("Lowe"), and John Stringham ("Stringham") placing fifth, seventh, and tenth respectively. (Id.)

Moreover, Ebner, the general manager of Guardian during Tyler's employment, and Grant's supervisor, was asked at his deposition about Tyler's job performance:

> Q. Now, was she [Tyler] strong at sales?
>
> A. Yes, she was.
>
> Q. Now, was she ever recognized for her sales strength?

---

[7]Guardian explained in this Position Statement that it "tracks sales at its various branches and compiles lists based on various sales data and publishes them in a monthly internal publican called 'The Contender.'" (Def.'s Mot. Summ. J., Tab I, Position Statement at 5, fn. 11.)

A.   Yes.  In all of our publications and the contenders, yes, she was recognized.

(Pl.'s Resp. Mot. Summ. J., Ex. D at 11.)  Ebner was also questioned about an email dated March

13, 2009, that he sent to Tyler in response to her March 12, 2009 email.  Ebner explained that

Tyler was looking for additional training and had sent him and Grant an email dated March 12,

2009, requesting such.  (Id. at 12.)  His response email stated:

> You have done an excellent job, Mia. . far beyond the norm.
> Check out next week's training first, as you have certainly
> graduated from the rookie status. .
>
> We are lucky in that Mia "Skywalker" has "Yoda" Grant to help
> you master the minor details!!

(Def.'s Mot. Summ. J., Tab Q.)  Ebner explained that such an email referring to Stars Wars is

"something that I would occasionally do, you know, from a more aerial perspective, for any of

the sales reps or any of the employees that were recognized who were doing good, you know, in

their – with their performance rankings.  I congratulated her for her – sales numbers at the time."

(Pl.'s Resp. Mot. Summ. J., Ex. D at 13.)  Such a complimentary email certainly indicates that as

of March 13, 2009, Ebner believed that Tyler was doing an "excellent job," and certainly in no

danger of losing her job as she needed only to "master the minor details."  (Def.'s Mot. Summ.

J., Tab Q.)

This glowing assessment of Tyler by Ebner on March 13, 2009 is in stark contrast to the

Performance Appraisal that Grant conducted sometime prior to March 23, 2009.[8]  As noted,

Tyler received an overall rating of 1.77 rating out of 5.0 which placed her between the

---

[8]See footnote 6.

"Unsatisfactory" and "Marginal" category.  (Id., Tab A, Ex. 42.)  In the Performance Appraisal,

Grant indicated that Tyler's performance was "seriously deficient requiring immediate attention

or correction or termination will be imminent."  (Id.)  Tyler stated in her deposition that "it would

be very, very difficult for me to receive a performance evaluation of 1.77 out of 5.0 in the

capacity of this job considering I was top ten in the country from the time I had my territory.  I

made over $700,000 for Guardian, and that would just be impossible for me to receive an

evaluation of this level."  (Pl.'s Resp. Mot. Summ. J., Ex. A at 131.)  Moreover, Ebner could not

explain in his deposition why Tyler received a score of 1 and 1.5 for "quantity" in her

Performance Appraisals when she was a top sales producer.  (Id. at 49-53.)  Likewise, Grant

could not explain at his deposition why Tyler received these scores for "quantity" even though he

scored the Performance Appraisals himself.  (Id., Ex. C at 111-113.)  In fact, Grant testified that

he did not know what "quantity" was referencing on the Performance Evaluation form.  He

stated, "[o]n this particular form where it says quantity, I don't know what it's referencing."  (Id.

at 111.)

The March 13, 2009 email from Ebner praising Tyler's job performance is also in

contradiction with Guardian's assertion that one of the main reasons that it terminated Tyler was

that on March 5, 2009, Berks Vice President, Mike Condos, contacted Grant and stated that

"from this day forward Mia is not to represent Berks Homes."  (Def.'s Mot. Summ. J., Tab A,

Ex. 41.)  Another contradiction with Ebner's email is a Guardian internal communication which

indicated that a determination had been made by Guardian to replace Tyler as early as March 27,

2009, and signed by a Guardian representative on March 30, 2009.  (Pl.'s Resp. Mot. Summ. J.,

15

Ex. E at 88-89; Ex. M.)[9]

The Court of Appeals for the Third Circuit stated in <u>Fuentes</u> that a plaintiff could defeat a motion for summary judgment if he or she could "demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." 32 F.3d at 765. Tyler, here, has demonstrated such inconsistencies and contradictions which raise questions about the reasons behind her termination. It is apparent from these contradictions that issues of material fact exist that should be decided by a jury. <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

In addition, Tyler has presented other evidence that she was treated differently than her similarly situated male co-workers which we believe also raise issues of material fact. First, with regard to Guardian's complaints about her error-prone paperwork, Tyler points to testimony from Ebner that male co-worker, Stringham, had problems with his paperwork, yet apparently was treated differently from her. Ebner testified that Stringham looked to be the "biggest offender" of failing to turn in paperwork. (Pl.'s Resp., Ex. E at 92.)

Next, Tyler claims that she was treated differently than her three male co-workers in that she was formally given Performance Appraisals by Grant, whereas her fellow male co-workers, Stringham, Blackman, and Lowe were not. Grant testified that of the four employees that reported to him, only Tyler was given a Performance Appraisal. (Pl.'s Mot. Summ. J., Ex. G at 25.) According to Grant, Stringham, Blackman, and Lowe were not given Performance Appraisals because they were "legacy" employees meaning they were not new hires. (<u>Id.</u> at 25-

---

[9]Exhibit M was filed under seal by agreement of the parties.

32.)  However, this is an issue for a factfinder to determine.

Tyler also asserts that she did not receive sufficient training, whereas her male co-workers who had years of experience at Guardian, were provided with additional training such as "boot camp."  (Pl.'s Resp. Mot. Summ. J., Ex. A at 50-60, 64-65.)  As noted above, Tyler reached out to her general manager, Ebner, in an email dated March 12, 2009, asking for more training to help her in her job.  (Def.'s Mot. Summ. J., Tab Q.)  She states in part:

> I would like to request to be registered to attend the Builder-LSC-Boot Camp Training held at Guardian Protection Services Corporate Offices near Pittsburgh, PA.  I have been performing the Builder-LSC position since September, 2008 and have not yet attended the training.
>
> I strive to perform in my position as Builder-LSC here at Guardian Home Technologies to the best of my ability.  I just started here with a suitable territory and leads to support in December, 2008.  I have set sales goals above what is expected monthly to achieve a minimum of 20 monitored sales per month.  I have met and exceeded this goal to date.  However, since I am exceeding my sales goal I also want to be sure that I am properly and fully trained like the other Builder-LSC staff.  I take pride in meeting and exceeding homeowner expectations and want to have proper training in an environment where I feel comfortable, and have the ability to ask questions and receive thorough answers with other relatively new Builder-LSC's.

(Id.)

In this email, Tyler is clearly seeking additional training stating that she wanted to be sure that she was "properly and fully trained like the other Builder-LSC staff."  (Id.)  Ebner testified that Tyler was never sent to the training boot camp that her co-workers had been sent to because Guardian required a minimum of three employees for it to conduct a boot camp, and they did not

have this number during Tyler's time there.  (Pl.'s Resp. Mot. Summ. J., Ex. D at 35.)  Ebner

added that Stringham, Blackman, and Lowe had been to this training because they all had been

with the company for several years.  (Id.)  However, the question arises why Ebner did not just

state this in his March 13, 2009 email reply to Tyler, and why he indicated in this reply that Tyler

really didn't need much additional training as she should just go to Grant "to help you master the

minor details!!"  (Def.'s Mot. Summ. J., Tab Q.)  For all the above reasons, we find that issues of

material fact exist to defeat this Motion for Summary Judgment.

### B.      Exhaustion of Administrative Remedies

Title VII and the Pennsylvania Human Rights Commission ("PHRC") require that a

plaintiff exhaust the administrative process prior to bringing suit in federal court by filing a

charge of discrimination with the EEOC and receiving a Right to Sue Letter ("RSL").  Burg v.

Borough Council of Montrose, 251 F.3d 465 (3d Cir. 2001); Woodson v. Scott Paper Co., 109

F.3d 913, 925 (3d Cir. 1996).  Guardian asserts that "Tyler has failed to exhaust her

administrative remedies with regard to her race and sex discrimination and harassment claims

under Title VII and the PHRA."  (Def.'s Mot. Summ. J. at 55.)  Guardian argues that Tyler's

"administrative complaint in EEOC charge number 530-2009-001896 has nothing to do with

race- or gender-based discrimination or harassment."[10]  (Id.)

Tyler responds that on July 20, 2009, she filed an EEOC complaint and charges of

discrimination on the basis of race and sex, and retaliation under charge number 530-2009-

01896.  (Pl.'s Resp. Mot. Summ. J., Ex. I.)  Tyler states that this document was time-stamped as

---

[10]As noted earlier, Tyler is not proceeding on her claims for racial and sexual harassment.

received by the Philadelphia EEOC office in August 2009.  (Id., Ex. J.)  Tyler asserts that "it appears in Exhibit 'J', dated July 22, 2011, that the EEOC made a typographical error by mistakenly referring to Exhibit 'I' as charge number 530-2009-03680, instead of 530-2009-01896.  (Id. at 14-15.)  Tyler argues that this "typographical mistake is evident from the Dismissal and Notice of Rights Letter issued on charge number 530-2009-03680."  (Id., Ex. K.) This letter provided notice that the EEOC was closing its file on this charge because the "charging party has already filed a lawsuit on these charges."  (Id., Ex. K.)

In its Reply, Guardian asserts that the documents in Exhibit J "reference the Armstrong Group of Companies at Charge No. 530-2009-03680 and Guardian Protection Services, Inc. at Charge No. 530-2009-03679."  (Def.'s Reply at 19.)  Guardian argues that "Charge No. 530-2009-01896, which is the Charge Number on the Charge of Discrimination enclosed with Tyler's counsel's July 30, 2009 correspondence to the EEOC and enclosed with Tyler's counsel's July 30, 2009 letter to Guardian is nowhere to be found."  (Id. at 20.)

Here, while it is not clear in the record that the EEOC made a typographical error by mistakenly referring to Exhibit 'I' as charge number 530-2009-03680, instead of 530-2009-01896, it seems likely that this is what occurred here because the EEOC did close its file on charge number 530-2009-03680 stating that the "charging party has already filed a lawsuit on these allegations."  (Pl.'s Mot. Summ. J., Ex. K.)  Moreover, regardless of whether the EEOC made a typographical error in its paperwork confusing the charge numbers, it is apparent that in Tyler's "Charge of Discrimination" initially filed with the EEOC, she claimed race and sex discrimination, as well as retaliation, against "The Armstrong Group of Companies/Guardian Protection" under "Charge Number 530-2009-01896."  (Id., Ex. I.)  In addition, Tyler received a

19

RSL letter on October 29, 2010, referencing this same charge number.  Accordingly, we find that Tyler has exhausted her remedies with regard to her sex and race discrimination claims now before this Court.

Lastly, as noted earlier, Guardian argues for the first time in its Reply that, "even assuming arguendo that Tyler's contention that the EEOC simply made a typographical error is accurate," there is a more significant defect with her case.  (Def.'s Reply at 20.)  Guardian states that Tyler admits to receiving a RSL on October 29, 2010, in her Response to the Summary Judgment Motion,[11] and that Tyler had ninety days after receiving this letter to file Title VII claims in this Court.  (Id.)  Guardian asserts that ninety days from October 29, 2010, was Thursday, January 27, 2011, and that because Tyler filed the instant action on Monday, January 31, 2011, her claims should be dismissed.  In support of its argument, Guardian cites Mosel v. Hills Dept. Store, Inc. which held that "[I]n the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day."  789 F.2d 251, 253 (3d Cir. 1986).

In her Response to this assertion, citing Federal Rule of Civil Procedure 6(d), Tyler states that "3 days are added after the period would otherwise expire under Rule 6(a)," when a party is required to act within a specified time after service under Federal Rule of Civil Procedure 5(b)(2)(C), (D), or (F).  (Resp. at 1.)  Tyler argues that "[t]herefore, under the 'mailbox rule,' the law presumes that Plaintiff received the Right to Sue letter mailed on October 29, 2010, on November 1."  (Id.)  In addition, Tyler asserts that in her Memorandum of Law in Response to

---

[11]Tyler states in her Response that "Plaintiff received a right to sue letter for these charges on October 29, 2010," and refers to Exhibit L.  (Pl.'s Resp. Mot. Summ. J. at 15.)

the Summary Judgment Motion she inadvertently made a reference to Exhibit L and indicated that she received the RSL on October 29, 2010.  (Reply at 2.)  Tyler now asserts that she received the RSL on November 1, 2010, and that the letter was only mailed on October 29, 2010.  (Id.) We agree with Tyler's position, and decline to dismiss Tyler's action on the basis of an untimely Complaint.

We make this finding because the RSL is dated October 29, 2010, but plainly stated under this date is the typed notation, "Date Mailed."  (Pl.'s Mot. Summ. J., Ex. L.)  Thus, based on the RSL before us which clearly indicates that October 29, 2010, was the date that the letter was mailed, we do not find that Tyler received it on this same date.  The Court of Appeals for the Third Circuit held in Seitzinger v. Reading Hosp. and Medical Ctr., that when the actual date of a RSL is known, that date controls as to when the ninety-day period for filing a Title VII action begins, however, in absence of other evidence, courts will presume that a Plaintiff received the letter three days after the EEOC mailed it.  165 F.3d 236, 239 (3d Cir. 1999).  Here, we presume that Tyler received the RSL three days after it was mailed which was November 1, 2010.  Ninety days from this date would have been Sunday, January 30, 2011.  Because this date fell on a Sunday, Tyler had until Monday, January 31, 2011, to file her Complaint.  See Federal Rule of Civil Procedure 6(a)(1)(C).  Since Tyler filed her Complaint on this date, we find that Tyler properly filed within the required ninety days.  Thus, this argument is without merit.

An appropriate Order follows.